**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| LOUIS FERRARA, MELISSA FERRARA, and NEW ENGLAND ALPACAS, <br><br> Plaintiffs, <br><br> v. <br><br> RYEN MUNRO and TRIPPING GNOME FARM, LLC, <br><br> Defendants. | Civil Action No. <br> 3: 16 - CV - 950  (CSH) <br><br><br><br> MARCH 23, 2018 |

## RULING ON DEFENDANTS' MOTION TO DISMISS

**HAIGHT, Senior District Judge:**

## I.  INTRODUCTION

This breach of contract action, relating to failure to pay commissions on the sale of alpacas, is currently before the Court on Defendants' Motion to Dismiss, Doc. 14.[1]  When filed, the motion was on behalf of both the individual defendant (Ryen Munro) and the corporate defendant (Tripping Gnome Farm, LLC) (sometimes, "TGF").  Subsequently, and while the motion to dismiss was pending, TGF filed a voluntary petition for bankruptcy in the District of Maine.  This Ruling resolves the motion to dismiss the complaint, and also considers the changed circumstances resulting from TGF's bankruptcy proceeding.

---

[1]  The Court takes judicial notice that an alpaca is a South American domesticated camelid. *See* https://www.britannica.com/animal/alpaca.  "[A]lpacas are slender-bodied animals with a long neck and legs, a short tail, a small head, and large, pointed ears." *Id.*  In appearance, they resemble small lamas; and their wool-like fleece coats are widely prized for their soft, lustrous properties and resistance to rain and snow.  *Id.*  Alpaca fleece is commonly woven to create fabrics used in parkas, sleeping bags, and linings for outerwear.  *Id.*

According to the allegations of the complaint, Plaintiffs Louis Ferrara and Melissa Ferrara are citizens of Connecticut. The Ferraras do business under the trade name of the third Plaintiff, New England Alpacas, whose principal place of business is located in Killingworth, Connecticut.

Plaintiffs bring this action against defendants Ryen Munro and Tripping Gnome Farm, LLC ("Defendants"), seeking contractual damages "arising from the Defendants' refusal to pay the Plaintiffs commission on the Defendants' sale of certain alpaca[s] to non-party Pamela Brewster and her company Stillmeadow Farm, LLC," located in Stonington, Connecticut. Doc. 1 ("Complaint"), ¶ 1. Plaintiffs allege that they entered into a binding contract with Defendants "under which the Defendants were obligated to pay the Plaintiffs a commission on the sale of alpacas by Defendants to Ms. Brewster and her company during a two-year period ending June 19, 2013." *Id.*. With respect to these alpaca sales, however, Defendants have allegedly "repeatedly refused to pay [Plaintiffs] the commission owed." *Id.*

In their Complaint, Plaintiffs have included the following state law claims against both Defendants: breach of contract, unjust enrichment, breach of the implied covenant of good faith and fair dealing, and violation of Connecticut's Unfair Trade Practices, Conn. Gen. Stat. § 42-110a, *et seq*. In addition, Plaintiffs assert a claim against individual defendant Munro for tortious interference with contractual relations. Since Plaintiffs assert only state law claims, they base this Court's subject matter jurisdiction solely on diversity of citizenship under 28 U.S.C. § 1332(a)(1).[2] Doc. 1, ¶ 2.

Pending before the Court is Defendants' "Motion to Dismiss" pursuant to Rules 12(b)(2),

---

[2] Upon the Court's review of the parties' affidavits [Doc. 20-22], the Court verified that such diversity of citizenship exists in this action.

b(3), and b(6) of the Federal Rules of Civil Procedure. Doc. 14. In particular, defendant Ryen Munro moves to dismiss the action against him for lack of personal jurisdiction under Rule 12(b)(2). In addition, both defendants, Munro and Tripping Gnome Farm, LLC, move to dismiss the action based on Connecticut's "prior pending action doctrine," which, as Defendants assert, "applies in this diversity case, as well as federal abstention principles."[3] Doc. 14, at 1.

## II. NOTICE OF BANKRUPTCY FILING BY TRIPPING GNOME FARM, LLC

The Court previously intended to resolve the motion to dismiss [Doc. 14] in its entirety herein. However, on October 10, 2017, counsel for Tripping Gnome Farm, LLC ("TGF") filed a notice of "Suggestion of Bankruptcy," informing the Court that on October 6, 2017, TGF filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.,* in the United States Bankruptcy Court for the District of Maine.[4] Doc. 32.

In the notice of bankruptcy, TGF's counsel stated, "[p]ursuant to Section 362(a) of the Code, this action is stayed." That is something of an overstatement. Pursuant to 11 U.S.C. § 362(a), the captioned action in this Court was automatically stayed *against TGF, the defendant debtor* upon the filing of its bankruptcy petition in the District of Maine. As to individual defendant Ryen Munro,

---

[3] Although Defendants have cited Rules 12(b)(3), the defense of "improper venue," and 12(b)(6), "failure to state a claim," they have failed to specifically address these defenses in the arguments in their supporting memoranda.

[4] The Court notes that in his "Suggestion of Bankruptcy" filing, TGF's' counsel stated, "Attached hereto is a true and correct copy of the Petition." Doc. 32, at 1. However, no such copy of the Petition was attached or filed with this Court. Counsel should forthwith complete its filing by adding that copy of the Petition. In the mean time, the Court nonetheless takes judicial notice that "Tripping Gnome Farm, LLC" filed "Official Form 201," captioned "Voluntary Petition for Non-Individuals Filing for Bankruptcy," Petition No. 17-20545 in the U.S. Bankruptcy Court for the District of Maine in Portland, Maine, on October 6, 2017. *See In re Tripping Gnome Farm, LLC*, Doc. 1 (Petition No. 17-20545).

there has been no suggestion to the Court, or evidence presented, that a bankruptcy filing was made by him as an individual. In general, the automatic stay is limited to debtors and does not encompass non-bankrupt co-defendants. *See Teachers Ins. & Annuity Ass'n of America v. Butler*, 803 F.2d 61, 65 (2d Cir. 1986) ("It is well-established that stays pursuant to § 362(a) are limited to debtors and do not encompass non-bankrupt co-defendants."); *see also Queenie, Ltd. v. Nygard Int'l,* 321 F.3d 282, 287 (2d Cir. 2003) ("[A] suit against a codefendant is not automatically stayed by the debtor's bankruptcy filing." ) (quoting 3 Collier on Bankruptcy § 362.03[3][d] (15th ed.2002)); *Thomson Kernaghan & Co. v. Global Intellicom, Inc.*, Nos. 99 Civ. 3005(DLC), 99 Civ. 3015(DLC), 2000 WL 640653, at *14 (S.D.N.Y. May 17, 2000) (Except in "unusual circumstances," "Section 362 limits the extension of an automatic stay to a proceeding against the debtor"— *i.e.*, does not encompass non-bankrupt co-defendants.); *In re Metal Center*, 31 B.R. 458, 462 (D.Conn.1983) ("Generally, the automatic stay does not apply to proceedings against nondebtors."); *Austin v. Unarco Indus., Inc.*, 705 F.2d 1, 4-5 (1st Cir.1983) ("[T]he Bankruptcy Court was correct in deciding that the automatic stay provisions of 11 U.S.C. § 362(a) apply only to the bankrupt debtor."), *cert. denied*, 463 U.S. 1247 (1983).

Because there has been no showing that defendant Munro is a bankruptcy debtor, there is no applicable § 362(a) stay of this action against him.[5] Accordingly, the action is stayed against debtor

---

[5]    The Court recognizes that there may be limited and unusual exceptions in which an extension of the stay to a non-bankrupt co-defendant is proper – *e.g.*, if the extension "contributes to the debtor's efforts to achieve rehabilitation" or the debtor and non-bankrupt codefendant are so closely related that the liability of the nondebtor may be imputed to the debtor. *See, e.g.*, *Teachers Ins. & Annuity Ass'n of America*, 803 F.2d at 65; *In re Johns–Manville Sales Corp*, 33 B.R. 254, 263–64 (S.D.N.Y.1983); *In re Metal Center*, 31 B.R. at 462 *; Matter of S.I. Acquisition, Inc*., 817 F.2d 1142, 1147–48 (5th Cir. 1987). For example, the automatic stay may apply to the non-debtor if the debtor is the guarantor on the non-debtor's obligations under the claim. *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003). In the case at bar, the parties have not established

4

TGF, but remains active with respect to defendant Munro.[6]  The Court will proceed in resolving the motion to dismiss as to this non-debtor individual defendant.  In light of the stay, claims pending against TGF will not be impacted by the Court's ruling on the motion to dismiss.  Those claims will remain in effect and stayed.

## III.  BACKGROUND

The main dispute at issue in this case arises from an alleged contract which Plaintiffs assert they entered with Tripping Gnome Farm, LLC (also "TGF").  Prior to June 20, 2011, Plaintiffs engaged "in the business of buying, raising, selling and brokering the sale of alpacas" at their place of business in Killingworth, Connecticut.  Doc. 1, ¶ 8.  Plaintiffs allege that Defendants, who "engaged in the business of breeding, raising, selling, and brokering the sales of alpacas," deceived them into disclosing the name of an interested alpaca buyer "by falsely leading the Plaintiffs to believe that if [they] did so, the Defendants would pay [them] the commissions set forth in the Contract."  Doc. 1, ¶¶ 9, 64.  Thereafter,  by "refusing to pay the agreed-to commissions, and by Munro preventing TGF from doing so, the Defendants gained an unfair business advantage over the Plaintiffs and all other similar businesses in that the Defendants illegally and unfairly made their

that any exception applies that would require Munro to be covered by the automatic stay. Munro is the managing member of the debtor, but there is no indication that any individual liability on his behalf should be attributed to debtor Tripping Gnome Farm, LLC, or vice-versa.

[6]  The Court takes judicial notice of the fact that the bankruptcy proceedings regarding Tripping Gnome Farm, LLC, Bk. No. 17-20545 (Bankr. D. Me. 2017), are still in progress.  Most recently, on February 21, 2018, Plaintiffs filed a motion to request an Order authorizing them to examine TGF and Ryen and Ursula Munro "to investigate the acts, conduct, property, and general financial affairs of the Debtor [TGF]," pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure. Bk. No. 17-20545 Doc. 12, ¶ 4.  In that motion, Plaintiffs assert that they are the "sole creditors of the Debtor" and "[t]he Debtor filed for bankruptcy on the eve of a trial to be held in Connecticut which the Ferraras expected to receive a significant verdict against the Debtor."  *Id.*, ¶¶ 2-3.  This motion remains *sub judice*.

products and services cheaper to sell to Connecticut residents." *Id.*, ¶ 65. Plaintiffs allege that

Defendants' conduct has been "immoral, unethical, oppressive, . . . unscrupulous," and offensive to

the public policy of Connecticut. *Id.,* ¶ 68.

In contrast, Defendants allege that no binding written contract exists because, *inter alia*,

Defendants "never signed." Doc. 15, at 1. Munro states in his Declaration that "[t]he Plaintiffs and

the Defendant Tripping Gnome Farm, LLC never agreed on the terms of the Master Contract that

was sent" and "[t]his lawsuit is based on the unsigned, draft Master Contract." Doc. 16, ¶¶ 8-9. The

alleged "Agreement," as presented by Plaintiffs, contains only the signatures of Melissa Ferrara and

Louis Ferrara. Doc. 22, Ex. A ("Brokering and Boarding Contract"), at 12. No signature of Ryen

Munro, in either his individual capacity or as a member or manager of TGF, appears on that contract.

Defendants argue that, despite the lack of a binding contract, Plaintiffs have commenced a

series of "four cases between Defendants and Plaintiffs" regarding this same contract dispute. *Id.*,

at 1-2. Defendants describe the four cases as follows:

> (1) an action that Tripping Gnome filed in the Cumberland County, Maine Superior Court (PORSC-CV-2014-00157), seeking a declaratory judgment with respect to the parties' rights and obligations (the "Maine Case");

> (2) an action that Plaintiffs subsequently filed in Connecticut Superior Court (MMX-CV14-6011790-S) (the "First Connecticut Case"), as a result of which the Maine Case was stayed;

> (3) another action that Plaintiffs filed in Connecticut Superior Court (MMX-CV15-6013059-S) (the "Pending Connecticut Case"), which is nearly identical to both the First Connecticut Case and the instant case and which was filed after rulings adverse to Plaintiffs in the First Connecticut Case, thus allowing Plaintiffs to continue to pursue essentially the same case regardless of those adverse rulings; and

> (4) now, the present case, in this federal Court.

Doc. 15, at 1-2.

Defendants state that three of the four cases – "all but the First Connecticut Case [(2), above], which Plaintiffs voluntarily withdrew after filing the Pending Connecticut case" – remain. *Id.*, at 2. According to Defendants, Plaintiffs have "repeatedly and unjustifiably tried to drag Ryen Munro into . . . three Connecticut cases as a party despite the absence of any allegations that Mr. Munro acted in any capacity other than as a manager of Tripping Gnome." *Id.* Moreover, each time the Connecticut Superior Court has ruled against Plaintiffs, they "have disregarded the ruling and tried again." *Id.* Defendants conclude that the present action before this Court is "no more than the latest harassing effort to pursue Ryen Munro, and also to effectively create an 'insurance policy' in the event that the pending Connecticut litigation is dismissed." *Id.* Moreover, "[t]he prior dismissals of Ryen Munro from Connecticut state court actions should be followed by his dismissal from this case as well." *Id.*

## IV. **DISCUSSION**

### A. **Standard for Dismissal under Rule 12(b)(2), Fed. R. Civ. P., for Lack of Personal Jurisdiction**

Defendant Ryen Munro moves to dismiss Plaintiffs' complaint for lack of personal jurisdiction under Rule 12(b)(2), Fed. R. Civ. P. In support of his motion, he claims that this Court cannot exercise personal jurisdiction over him under Connecticut's long-arm statute, Conn. Gen Stat. § 52-59b, because he lacks the requisite minimum contacts with either the state of Connecticut or this District.

A motion to dismiss must be granted if a court lacks personal jurisdiction over a defendant. Fed. R. Civ. P. 12(b)(2). On a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), "the plaintiff bears the burden of showing that the court has jurisdiction over the

defendant." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996) (citing *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir.1994)). Prior to discovery, a plaintiff may defeat the motion "based on legally sufficient allegations of jurisdiction." *Metro. Life Ins. Co.,* 84 F.3d at 566 (citation omitted). "A prima facie case [of personal jurisdiction] requires nonconclusory fact-specific allegations or evidence showing that activity that constitutes the basis of jurisdiction has taken place." *Chirag v. MT Marida Marguerite Schiffahrts*, 604 F. App'x 16, 19 (2d Cir.2015) (citing *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 186 (2d Cir.1998)).

In general, the district court may exercise discretion in determining the best procedural approach to decide a 12(b)(2) motion for lack of personal jurisdiction. Specifically, "[i]n deciding a pretrial motion to dismiss for lack of personal jurisdiction a district court has considerable procedural leeway" and "may determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (*per curiam*) (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)). *See also, e.g., Blau v. Allianz Life Ins. Co. of N. Am.*, 124 F. Supp. 3d 161, 170 (E.D.N.Y. 2015).

Because a motion to dismiss for lack of personal jurisdiction is "inherently a matter requiring the resolution of factual issues outside of the pleadings . . . all pertinent documentation submitted by the parties may be considered in deciding the motion.*" Energy Brands, Inc. v. Spiritual Brands, Inc.*, 571 F. Supp. 2d 458, 463 (S.D.N.Y. 2008) (quoting *Pilates, Inc. v. Pilates Inst., Inc.*, 891 F. Supp. 175, 178 n. 2 (S.D.N.Y. 1995)). When considering the motion, the court must construe the pleadings liberally for the benefit of the plaintiffs. *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir. 1985)*.*

When no evidentiary hearing is held, but extensive discovery has been conducted, "the plaintiff's prima facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant." *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990), *cert. denied*, 498 U.S. 854 (1990). As described above, absent an evidentiary hearing, when the motion is "decided on the basis of affidavits and other written materials, the plaintiff need only make a prima facie showing." *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012) (citation omitted). In that instance, "the allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits."[7] *Id.*

In a diversity or federal question case, personal jurisdiction is determined by the law of the state in which the district court sits. *See Bensusan Restaurant Corp. v. King*, 126 F.3d 25, 27 (2d Cir.1997); *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 231 (2d Cir.1963). If the exercise of jurisdiction is appropriate under that state's statute, the court then must decide whether such exercise comports with the requisites of constitutional Fourteenth Amendment due process. *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996), *cert. denied*, 519 U.S.107 (1996). *See also World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

---

[7]    In contrast, if the defendant comes forward with evidence in an evidentiary hearing, the plaintiff must then demonstrate personal jurisdiction by a preponderance of the evidence. *Metro. Life Ins. Co.*, 84 F.3d at 566. *See also Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 n.3 (2d Cir. 1984) ("If . . . the district court holds an evidentiary hearing, the plaintiff must demonstrate personal jurisdiction by a preponderance of the evidence").

**B.    Personal Jurisdiction over Ryen Munro**

A defendant's conduct is sufficient for the exercise of personal jurisdiction if:    (1) the conduct satisfies the requirements of the relevant state's long-arm statute, and (2) the conduct satisfies the "minimum contacts" requirement of the Due Process Clause of  the Fourteenth Amendment.  *See, e.g., Doe v. Ciolli*, 611 F. Supp. 2d 216, 220-21 (D. Conn. 2009) (citing *Inset Sys., Inc. v. Instruction Set, Inc.*, 937 F.Supp. 161, 163 (D.Conn.1996)) .

As for the law of Connecticut, "the state where the district court is located," the applicable statute, Conn. Gen. Stat. § 52-59b (captioned "Jurisdiction of courts over nonresident individuals") states in relevant part:

> (a) As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident individual . . . who in person or through an agent: (1) Transacts any business within the state; (2) commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; (3) commits a tortious act outside the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if such person or agent (A) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (B) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; (4) owns, uses or possesses any real property situated within the state; or (5) uses a computer, as defined in subdivision (1) of subsection (a) of section 53-451, or a computer network, as defined in subdivision (3) of subsection (a) of said section, located within the state.

As discussed more fully below, Plaintiffs argue that there is personal jurisdiction over Munro pursuant to Conn. Gen. Stat. §§ 52-59b(a)(1) (defendant "[t]ransacts any business" in Connecticut) and  (a)(3) (defendant "commits a tortious act outside the state causing injury to person or property within the state").

1.  **<u>Proper Service of Process</u>**

In order for this Court to exercise personal jurisdiction over Defendant Munro, there must first be an appropriate service of process upon him, providing him with adequate notice of the claim.[8] Then there must be an adequate basis for jurisdiction.

Under Federal Rule of Civil Procedure 4(e), "[u]nless federal law provides otherwise, an individual . . . may be served in a judicial district of the United States by: (1) following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made;" or by "delivering a copy of the summons and of the complaint to the individual personally;" "leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there;" or "delivering a copy of each to an agent authorized by appointment or by law to receive service of process."

Moreover, "[a]ny nonresident individual . . . over whom a court may exercise personal jurisdiction, . . . shall be deemed to have appointed the Secretary of the State as [his] attorney and to have agreed that any process in any civil action brought against the nonresident individual . . . may be served upon the Secretary of the State and shall have the same validity as if served upon the nonresident individual . . . personally." Conn. Gen. Stat.§ 52-59b(c).

---

[8]  With respect to the "territorial limits of effective service" for personal jurisdiction, Federal Rule of Civil Procedure 4(k)(1)(A) provides, in pertinent part:

(1) *In General.* Serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant:

(A) who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located; . . .

Fed. R. Civ. P. 4(k)(1)(A).

According to the case docket, in compliance with Conn. Gen. Stat. § 52-59b, Munro was served on September 15, 2016, by Robert S. Miller, State Marshal for New Haven County, who left a copy of the summons and complaint with the Secretary of State of Connecticut, as Agent for Service. *See* Doc. 6 ("Summons Returned Executed," 9/1/2016). Also on that date, Miller sent a copy of the summons and complaint by certified mail, return receipt requested to: Ryen Munro, 64 Lupine Lane, Freeport, ME 04032. *Id.* Upon these facts in the case record, there appears to have been proper service upon Munro under Connecticut's long-arm Statute, Conn. Gen. Stat. § 52-59b(c).[9] Moreover, Munro has not challenged the method of service upon him. The Court thus finds that proper service has been effected and proceeds to the next requirement for the exercise of personal jurisdiction

### 2. Connecticut's Long-Arm Statute

Turning to the specific language of Connecticut's long-arm statute, the Court must determine whether Connecticut law confers any basis for this Court to exercise jurisdiction over defendant Ryen Munro. Plaintiffs assert that "Munro is a nonresident who transact[ed] business in this state, and who committed a tortious act outside the state causing injury to the Plaintiffs in Connecticut, while deriving substantial revenue from alpaca[-]used, and alpaca-related services rendered, in Connecticut." Doc. 24, at 14.

### a. Transaction of Business under Conn. Gen. Stat. § 52-59b(a)(1)

In support of personal jurisdiction based on transaction of business, Plaintiffs state that Munro sent telephone and email communications into Connecticut and therefore engaged in conduct

---

[9] That being said, whether service is proper will hinge upon whether, in this case, Munro is actually a "nonresident individual . . . over whom a court may exercise personal jurisdiction." Conn. Gen. Stat.§ 52-59b(c). This issue is resolved *infra.*

within this state pursuant to Conn. Gen. Stat. § 52-59b. Factually, Plaintiffs allege that Munro "personally participated in the conduct constituting contractual breaches and tortious conduct." Doc. 24, at 15. "The contract was negotiated between the Plaintiffs and Munro in significant part over the telephone and by electronic mail while the Plaintiffs were physically located in Connecticut." Doc. 1, ¶ 14. "On or about June 17, 2011, Munro accepted the Plaintiffs' offer to enter a contract which incorporated the terms of the Plaintiffs' standard Brokering and Boarding Contract, modified by the negotiations between the parties." *Id.*, ¶ 16. "On or about June 20, 2011, the Plaintiffs performed their obligations under the Contract by disclosing Ms. Brewster's name and contact information to Munro via email." *Id.*, at ¶ 20. "Upon information and belief, Muno [sic] has undercapitalized TGF, and TGF is now effectively insolvent and unable to pay the full judgement the Plaintiffs demand in this action." *Id.*, ¶ 39.

Plaintiffs support these factual allegations with the affidavit of Melissa Ferrara [Doc. 24-7, Ex. G]. She has testified, *inter alia*, that she and her husband "negotiated the Agreement with Munro and with [TGF]," Doc. 24-7, ¶¶ 5, 7; the "negotiations occurred primarily via email " while the Ferraras were in Connecticut, *id.*, ¶ 7; the Agreement demanded services by the Ferraras while they were in Connecticut, *id.*, ¶ 6; and on June 17, 2011, Munro sent an email to the Ferraras in Connecticut, accepting their offer to enter the agreement, *id.*, ¶ 8. Plaintiffs further allege that on June 20, 2011, "Munro sent an email to [Ferrara's] husband and [her] asking [the Ferraras] to perform [their] obligations under the Agreement by disclosing the Buyer's identity;" and the Ferraras therefore disclosed that identity, *id.*, ¶¶ 12- 14. Munro then allegedly sent two commission checks to the Ferraras for two separate sales of alpacas under the Agreement, *id.*, ¶¶ 22-24; and on September 25, 2011, Munro arranged for the alpacas which were the subject of the Agreement to be

transported into Connecticut and delivered to the buyer's farm in Stonington, Connecticut, *id.*, ¶ 25.

In addition, Plaintiffs allege that Munro "derived substantial revenue from goods used and services rendered in Connecticut." Doc. 24, at 18. They allege that "[m]any of the alpacas the Defendants sold and delivered into Connecticut – and which were the subject of the Agreement at issue in this action – were personally owned by Munro and his wife." *Id.* Plaintiffs point to sales of alpacas that they allege Munro made personally to Connecticut buyers. Doc. 24, at 18-19 (describing sales of alpacas named Snow Drop, Apocalypse, and Sub-conscious Hero to Connecticut buyer, Pamela Brewster); *see also* Ex. H, at 11-14.

In support of dismissal of the complaint as against him, Munro asserts that he has had no "contacts with the State of Connecticut that are not linked inextricably to his duties as a manager of Tripping Gnome." Doc. 15, at 9. Specifically, he has testified by affidavit that Plaintiffs approached him at a trade show in Springfield, "Massachusetts to inquire if Tripping Gnome Farm LLC had livestock for sale." Doc. 16 (Munro Declaration), ¶¶ 2-3. Their next solicitation occurred "via emails by the Plaintiffs to the place of business of Defendant Tripping Gnome Farm, LLC in Maine." *Id.*, ¶ 4. The solicitation thereafter continued "when the Plaintiffs came to the place of business of the Defendant Tripping Gnome Farm, LLC in Maine." *Id.*, ¶ 5. Although Plaintiff's solicitations continued by email to TGF in Maine, *id.*, ¶6, Munro testifies that TGF "never agreed on the terms of the Master Contract that [Plaintiffs] sent" so never agreed to enter that contract, *id.*, ¶¶ 7-8. Accordingly, Munro never signed the Master Contract.[10] *Id.*, ¶9.

---

[10] Munro explains in further detail that TGF "had already rejected [the contract's] terms by email. The Master Contract was also incomplete, in error, had unfilled blanks, did not contain the Defendants' names, did not contain the animals' names and did not even contain the Plaintiffs' names." Doc. 16, ¶ 7.

Rather, a customer of the Plaintiffs and TGF "entered into and consummated separate contracts ('Sales Contracts') for the sale of three animals," and the Plaintiffs "received a brokerage commission from [TGF] on only one animal in the Sales Contract." *Id.*, ¶ 10. The sales all "took place, were negotiated, and were consummated in the State of Maine." *Id.*

Furthermore, Munro avers that he "never had personal business, actual or proposed, with the Plaintiffs." *Id.*, ¶ 11. He "never entered or traveled to Connecticut in any of the dealings with the Plaintiffs." *Id.*, ¶ 12. Furthermore, he "did not transact business in Connecticut and do[es] not regularly solicit or transact business in Connecticut." *Id.*, ¶ 13. In sum, Munro has testified that his "only involvement and activities with the Plaintiffs was as a member/manager of Tripping Gnome Farm, LLC." *Id.*, ¶ 14.

### b. **Munro's Alleged Activities**

With respect to the evidence presented in determining whether Munro "transacted business" in Connecticut under the first prong of Conn. Gen. Stat. § 52-59b(a), the Connecticut Supreme Court has held that the term "transacts any business" embraces a "single purposeful business transaction" within Connecticut. *Zartolas v. Nisenfeld*, 184 Conn. 471, 474 (1981). Moreover, a non-resident individual who has not entered the state may be subject to jurisdiction under § 52-59b(a)(1) if that person has "invoked the benefits and protections of Connecticut's laws" by virtue of his "purposeful Connecticut related activity." *Id.* at 475.

However, "[t]he term 'transacts business' is 'not broadly interpreted in Connecticut.'" *LucidRisk, LLC v. Ogden*, 615 F. Supp. 2d 1, 5 (D.Conn. 2009) (quoting *Goudis v. Am. Currency Trading Corp.*, 233 F. Supp.2d 330, 334 (D.Conn. 2002)). For example, "the negotiation of contracts, standing alone, does not constitute 'transacting business' in Connecticut." *LucidRisk*, 615

F. Supp. 2d at 5 (quoting *Goudis*, 233 F. Supp. 2d at 334). Furthermore, "[t]he transmission of communications between an out-of-state defendant and a plaintiff within the jurisdiction does not, by itself, constitute the transaction of business in the forum state." *Bross Utilities Serv. Corp. v. Aboubshait*, 489 F. Supp. 1366, 1371-72 (D. Conn. 1980) (gathering cases), *aff'd*, 646 F.2d 559 (2d Cir. 1980); *see also Nedgam Productions, LLC v. Bizparentz Foundation*, No. 3:09-cv-500 (CFD), 2010 WL 3257909, at * 5 (D. Conn. April 29, 2010) (holding "the sending of a letter insufficient to be considered 'transacting business'"); *Tatoian v. Junge*, No. 3:13-CV-1255 (VLB), 2013 WL 6195486, at *3 (D. Conn. Nov. 26, 2013) ("[I]t cannot be said that [non-resident's] single act of sending one allegedly defamatory e-mail into Connecticut is sufficient for the purpose of establishing personal jurisdiction under the long-arm statute."); *Greene v. Sha-Na-Na*, 637 F. Supp. 591, 596 (D.Conn.1986) (nonresident's telephone call, telegram and letter to Connecticut plaintiff did not constitute transaction of business within meaning of § 52-59(a)(1)); *Connecticut Artcraft Corp. v. Smith*, 574 Conn. 626, 631 (1983) (nonresident's telephone calls to alleged co-conspirators in Connecticut concerning trade secrets of their former employer, a Connecticut corporation, did not constitute transaction of business within meaning of § 52-59b(a)(1)) ; *Schembri v. Physicians for Women*, P.C., No. 323672, 1997 WL 282130, at *3 (Conn. Super. Ct. May 19, 1997) ("[M]erely mailing a report to a Connecticut resident is not sufficient to constitute 'transacting business' within the state.").

In sum, "[n]o single event or contact connecting defendant to the forum state need be demonstrated; rather, the totality of all defendant's contacts with the forum state must indicate that the exercise of jurisdiction would be proper." *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986). "The test is not whether each of these individual items standing alone constitutes the

transaction of business in Connecticut but, rather, whether the totality of circumstances shows the transaction of business." *Mitchell v. Patterson*, No. 4001501, 2005 WL 1671528, at *7 (Conn. Super. Ct. June 21, 2005). "A court must consider the totality of circumstances when determining the existence of purposeful activity, and may not subject the defendant to jurisdiction based on random, fortuitous, or attenuated contacts." *Id.* (citing *CutCo Indus.*, 806 F.2d at 365). Both the nature and the quality of the defendant's acts must be assessed to determine whether there are sufficient "minimum contacts" to "provide a fair warning to the defendant of a possibility of being subject to courts of the forum state." *SAS Grp., Inc. v. Worldwide Inventions, Inc.*, 245 F. Supp. 2d 543, 548 (S.D.N.Y. 2003). Furthermore, in interpreting whether a defendant has transacted business, the Connecticut courts "do not resort to a rigid formula [but] balance considerations of public policy, common sense, and the chronology and geography of the relevant factors." *Zartolas*, 184 Conn. at 474.

In the case at bar, Munro testified by affidavit that he has "never had personal business, actual or proposed, with the Plaintiffs." Doc. 16, ¶ 11. He also declared he has "never entered or traveled to Connecticut" for any dealings with the Plaintiffs. *Id.*, ¶ 12. He does not transact business in Connecticut or regularly solicit business in Connecticut. *Id.*, ¶ 13. Moreover, rather than Munro personally engaging in business with buyers of alpacas, TGF has entered into three contracts for the sale of alpacas. *Id.,* ¶ 10. In short, his "only involvement and activities with the Plaintiffs was as a member/manager of Tripping Gnome Farm, LLC."[11] *Id.,* ¶ 14.

---

[11] For example, with respect to the contracts for purchase of individual alpacas, allegedly sold personally by Ryen and Ursula Munro, the Court notes that in the very heading of these contracts, there is a logo with the depiction of an alpaca with the title, "Tripping Gnome Farms Alpacas"; and this heading appears at the top of each page of these purchase contracts. Doc. 24-8, at 11-23. Furthermore, at the top of each contract, the Seller is listed as "Tripping Gnome Farm

TGF acting "via Munro" does not make the allegedly offending business conduct that of Munro personally. According to his sworn affidavit, Munro acted only on behalf of TGF. That includes sending emails and all of the other conduct that Plaintiffs cite as "doing business" in Connecticut. Doc. 25, at 8. Moreover, the fact that Munro would "derive a profit" from TGF's business activities simply follows from his status as a member of TGF. Munro made no profits apart from or above those obtained by TGF. In other words, TGF engaged in business in Connecticut via Munro; but Munro did not act separately from TGF. The documents and emails submitted by Plaintiffs support that fact.

Plaintiffs allege that, in challenging personal jurisdiction over individual defendant Ryen Munro, Defendants have indirectly invoked the "fiduciary shield doctrine," which is "based upon the notion that it is unfair to subject a corporate employee personally to suit in a foreign jurisdiction when his only contacts with that jurisdiction have been undertaken on behalf of his corporate employer." Doc. 15-4, at 11 (quoting *West State Mechanical, Inc. v. Paramount Health Resources, Inc.*, No. CV-07-5002640-S (Conn. Super. Ct. Mar. 12, 2008)). Plaintiffs assert that this doctrine was expressly rejected by a prior Connecticut Superior Court ruling in *Under Par Associates, L.L.C. v. Wash Depot A., Inc.*, 47 Conn. Supp. 319, 327 (Super. Ct. 2001), in which the court

---

LLC," with the names of "Ryen and Ursula Munro" appearing either above or below. *Id.*, at 11, 14, 19. Ryen Munro and Ursula Munro signed the purchase contracts for the "Sellers;" however, they are and were the only two members of the TGF limited liability company. *Id.*, at 14, 18, 23. Therefore, their signatures on these TGF contracts are consistent with sales by TGF, the limited liability company.

The Court notes that Munro has challenged the notion that the sale of the alpacas Apocalypse and Sub-Conscious Hero were the subject of any agreement between TGF and Plaintiffs. Munro therefore paid no commission upon them. The Connecticut buyer of those alpacas has made no known complaints, either in contract or in tort, against TGF or Munro regarding those sales.

concluded that "the 'fiduciary shield' doctrine finds no place in the text or underlying policy of 52-59b."

However, "the appellate courts in Connecticut have not yet ruled on the viability of [the fiduciary shield] doctrine and there is a split of authority in the Superior Courts." *Ruocco v. Metro. Boston Hockey League*, No. CV074024835S, 2007 WL 4635000, at *5 (Conn. Super. Ct. Dec. 7, 2007). *See also Sobol Family P'ship v. Cushman & Wakefield*, No. X04CV044003559S, 2005 WL 3047412, at *3 (Conn. Super. Ct. Nov. 1, 2005) ("There does not appear to be binding authority in this state on the issue of the fiduciary shield doctrine.").

A number of Connecticut courts continue to apply the fiduciary shield doctrine, finding persuasive authority for its application. *See, e.g.*, *W. State Mech., Inc. v. Paramount Health Res., Inc.,* No. LLICV075002640S, 2008 WL 809021, at *3 (Conn. Super. Ct. Mar. 12, 2008) ("The majority of Superior Courts in this state recognize the 'fiduciary shield' and apply it where appropriate. . . .This court finds the majority position to be more persuasive."). Under the fiduciary shield doctrine, "[w]hen examining the corporate officer's activities, the court must look to his personal contacts with the state of Connecticut and not to the contacts made on behalf of any corporate entity of which he was an officer or controlling shareholder." 2008 WL 809021, at *3 (quoting *Shafik v. Andria*, No. CV 06 5001472, 2007 WL 1677431, at *6 (June 1, 2007)).[12]

_____

[12] In *Shafik*, Connecticut Superior Court Judge Robert Shapiro held that "[i]n Connecticut, the general rule is that there is no personal jurisdiction over nonresident officers of a corporation where their contact with the state was only in their capacity as a corporate officer." 2007 WL 1677431, at *6 (Conn. Super. Ct. June 1, 2007). Moreover, "[i]n view of the 'corporate-styled liability shield' afforded by the limited liability company structure, *PB Real Estate, Inc. v. DEM II Properties*, 50 Conn. App. 741, 742 (1998), these principles are equally applicable here to Walters [an LLC managing member] , who was acting on behalf of a limited liability company." *Id.,* at *7 (lateral citations omitted).

The District of Connecticut has also applied the "fiduciary shield doctrine" to determine personal jurisdiction in diversity cases. *See, e.g., Milne v. Catuogno Court Reporting Servs., Inc.*, 239 F. Supp. 2d 195, 203 (D. Conn. 2002) ("[P]ersonal jurisdiction may not be asserted over [an officer] of a corporation based on [his] transaction of business in Connecticut where the [officer] did not transact any business other than through the corporation, as in the present case.") (quoting *Adams v. Wex*, 56 F. Supp. 2d 227, 229 (D. Conn.1999) and collecting cases)); *Bross Utilities Serv. Corp. v. Aboubshait,* 489 F. Supp. 1366, 1373-74 (D. Conn. 1980) ("Nothing in the record indicates that the individual defendants transacted any business other than through the corporations which they controlled. Accordingly, the court's conclusion that the plaintiff's claims against the corporate defendants did not arise out of the transaction by them of any business in Connecticut compels a finding that the same claims against the individual defendants similarly do not confer in personam jurisdiction on this court under Conn. Gen. Stat. § 52-59b(a)(1)."), *aff'd*, 646 F.2d 559 (2d Cir. 1980); *Hagar v. Zaidman*, 797 F. Supp. 132, 137 (D. Conn. 1992) ("Plaintiffs offer no rationale why this court should consider Zaidman anything but a corporate officer of PSG" so there was no personal jurisdiction over him.).[13]

_____

[13]  Due to the lack of binding authority regarding the "fiduciary shield doctrine," there are other cases holding the doctrine to be in disfavor, some relying on Judge Blue's opinion in *Under Par Associates, LLC v. Wash Depot A., Inc.*, 47 Conn. Supp. 319, 793 (2001). *See, e.g.*, *Paragon Realty Grp. LLC v. Lecates*, No. 3:06-CV-846 (CFD), 2007 WL 419617, at *2 (D. Conn. Feb. 5, 2007) ("[T]he fiduciary shield doctrine has been disfavored by Connecticut courts.") (citing *Dictaphone Corp. v. Gagnier,* No. 3:05-CV-266 (CFD), 2006 WL 726675, at *2 (D.Conn. Mar. 22, 2006)); *Panterra Engineered Plastics, Inc. v. Transportation SYS. Sols., LLC*, 455 F. Supp. 2d 104, 113 (D. Conn. 2006)("[I]t was determined that "the 'fiduciary shield doctrine' has not been adopted by the Connecticut [s]tate [c]ourts and there is a considerable question as to its justification,' and 'individuals should not be shielded from their own conduct simply because they were acting on behalf of a corporation or other entity.'") (quoting *Grunberger Jewelers v. Leone*, No.3: 03-CV-647 (CFD), 2004 WL 1393608, at *3 (D. Conn. June 18, 2004)).

Under the facts presented, Munro has testified by affidavit that he "never had personal business, actual or proposed, with the Plaintiffs." Doc. 16, ¶ 11. He also "never entered and or traveled to Connecticut in any of the dealings with the Plaintiffs" and "did not transact business in Connecticut" and does "not regularly solicit or transact business in Connecticut." *Id.*, ¶¶ 12-13. If the Court applies the "fiduciary shield doctrine," which several Connecticut courts view as the majority approach in such cases, Munro has failed to transact business under Conn. Gen. Stat. § 52-59b(a)(1) of Connecticut's long-arm statute.[14] There is no proof Munro performed any business actions outside of his position as a managing member of TGF.

In opposition, Plaintiffs have asserted that Munro "transacted business" within the state of Connecticut by negotiating the contract at issue with the Plaintiffs by telephone and electronic mail, mailing a check with Munro's name preprinted on it to Plaintiffs, and arranging for the alpacas to be transported and delivered to Connecticut. Doc. 24-7 (Ferrara Affidavit), ¶¶ 5-7, 13-15, 19, 20-22, 25. Plaintiffs further point to the sale of alpacas to a Connecticut buyer, upon which Plaintiffs claim

---

[14]As set forth *infra*, even if the Court assumes arguendo that the "fiduciary shield doctrine" lacks authority or otherwise fails to shield Munro from personal jurisdiction, the Court must examine whether the individual defendant has sufficient minimum contacts with the forum state such that "personal jurisdiction complies with federal due process standards." *Isola v. RJL Elec. Corp.*, No. CV-13-6018537-S (Conn. Super. Ct. Mar. 28, 2014)). "The better course is that the contacts with the forum of each defendant – the corporate officer and the corporation – 'must be assessed individually,' both with regard to the long-arm statute and due process analysis. . . . While the actions of a corporate officer may typically be attributed to the corporation under agency principles for purposes of determining jurisdiction over the corporation, the actions of the corporation (undertaken by other individuals) should not ordinarily be attributed to the individual corporate officer for purposes of determining whether jurisdiction exists over that individual. At the same time, however, individuals should not be shielded from their own conduct simply because they were acting on behalf of a corporation or other entity." *Grunberger Jewelers v. Leone*, No. CIV.A. 303CV647CFD, 2004 WL 1393608, at *3 (D. Conn. June 18, 2004) (internal citation omitted). In this case, there is no indication that Munro engaged in any purely personal conduct in Connecticut. as opposed to his limited activity on behalf of TGF.

they are owed a 10% commission. Doc. 24, at 18 (citing Complaint [Doc. 1], at ¶ 33). Plaintiffs have also submitted alpaca sales contracts between TGF and Pamela Brewster of Stonington, Connecticut, Doc. 24-8, at 11-23, and emails indicating that Munro once visited Brewster's Connecticut farm (in December 2012) to discuss the possibility of TGF assisting in her creation of an alpaca herd, *id.*, at 62; and another email in which Munro planned to visit Brewster's farm in January of 2013 to "trim teeth and talk about the spring shows and shearing," *id.*, at 66, regarding alpacas TGF had sold to Brewster.

However, the evidence Plaintiffs presented is insufficient to prove that Munro engaged in transactions in Connecticut which were *not TGF* transactions. The contract that was proposed by Plaintiffs was one with TGF. *See* Doc. 16 (Munro Declaration), ¶ 2 ("The Plaintiffs, Louis Ferrara and Melissa Ferrara as partners of New England Alpacas . . . approached the Defendant Tripping Gnome Farm, LLC in Massachusetts to inquire if Tripping Gnome Farm, LLC had livestock for sale."). Also the sales contracts Plaintiffs have now produced were printed on paper with the letterhead "TRIPPING GNOME FARM, LLC *Alpacas*." *See, e.g.*, Doc. 24-8, at 11. Munro's trip to Brewster Farms and two follow-up trips to Connecticut, for alpaca care, were pursuant to the sales of TGF alpacas to Brewster's Stillmeadow Farms. As Superior Court Judge Julie Aurigemma stated in the Pending Connecticut Case:

> The plaintiffs have not set forth any allegations that provide the manners in which the individual defendant purposely engaged in transactions separate and apart from the defendant corporation. By melding the Munros and the corporation together under the label of 'TGF' and 'defendants,' and using this interchangeably, the plaintiffs are essentially alleging that because of the actions the individual defendants took on behalf of the corporation, the individual defendants are also subject to personal jurisdiction.

*See Ferrara, et al. v. Munro, et al.*, Case No. MMX-CV15-601059-S, 2015 WL 4497064 (Conn.

Super. Ct. 2015) (the "Pending Connecticut Case") ("Memorandum of Decision on Motion to Dismiss," dated June 25, 2015); *Ferrara v. Munro*, No. MMXCV146011790, 2014 WL 7495066, at *2 (Conn. Super. Ct. Nov. 20, 2014)(the "First Connecticut Case")("Memorandum of Decision on Motion to Dismiss," dated Nov. 20, 2014). Accordingly, Judge Aurigemma held that the court could not exercise jurisdiction over Munro pursuant to Conn. Gen. Stat. § 52-59b(a)(1).

In the state cases, as in this one, Plaintiff Melissa Ferrara filed an affidavit, attempting to provide evidentiary support for personal jurisdiction.[15] Nonetheless, after considering Plaintiff's submissions, in the Pending Connecticut Case, the Superior Court denied reconsideration of its ruling on the motion to dismiss, thereby adhering to its finding that there was no personal jurisdiction over Ryen Munro. Case No. MMX-CV15-601059-S , Doc. 116.10 (denying Doc. 116 ("Motion for Reconsideration" regarding decision to dismiss Plaintiff's claims against Ryen Munro).[16]

### c. Tortious Interference under Conn. Gen. Stat. § 52-59b(a)(3)

Plaintiffs also argue that Munro is subject to this Court's jurisdiction because he committed the act of fraud, a "tortious act within the state" or "a tortious act outside the state causing injury to

---

[15] Melissa Ferrara filed the same affidavit she filed in the state cases in the present case. Doc. 24-7, at 3-5. The totality of facts to which she attests, however, fail to demonstrate that Munro either personally "transacted business" or performed "a tortious act" in an individual capacity, as opposed to on behalf of TGF

[16] The Superior Court in both the Pending Connecticut Case and its predecessor stated that "[a]lthough Connecticut jurisprudence does not recognize the [fiduciary shield] doctrine, 'neither does Connecticut law hold that officers are automatically subject to personal jurisdiction simply by virtue of their status as corporate officers and shareholders.'" *Ferrara v. Munro*, No. MMXCV156013059, 2015 WL 4497064, at *2 (Conn. Super. Ct. June 25, 2015) (quoting *Isola v. RJL Electric Corp.*, 57 Conn. L. Rptr. 834, 836 (Conn. Super. Ct. March 28, 2014)). "Each determination is based on whether, in a given case, the corporate officer has sufficient minimum contacts with the forum state such that personal jurisdiction complies with federal due process standards." *Id.* (quoting *Isola*, 57 Conn. L. Rptr. at 836).

person or property within the state." Conn. Gen. Stat. § 52-59b(a)(2), (3).   That argument fails for multiple reasons.

First, Munro has testified that he never entered the state to engage in any dealings with Plaintiff, much less commit a tortious act against them. Doc. 16, ¶12.   Furthermore, any tortious act he was alleged to commit in Maine or Massachusetts is insufficient to provide long-arm jurisdiction under the Connecticut statute because Munro does not regularly do or solicit business, engage in any other "persistent course of conduct," or derive "substantial revenue from goods used or consumed or services rendered, in the state,"  Conn. Gen. Stat. § 52-59b(a)(3)(A).  He also does not expect or "reasonably expect [any] act [he committed] to have consequences in the state" and did not, apart from TGF, derive "substantial revenue from interstate or international commerce. " *Id.* (a) (3)(B). Any revenue he derived was for TGF, of which he is a member.

Moreover, Munro does not own, use or possess "any real property situated within the state" or use a computer or computer network located in Connecticut.  *Id*. (a)(4)-(5).  Plaintiffs' allegations and assertions do not, therefore, establish a basis for personal jurisdiction over Munro due to an alleged "tortious act."

### 3.  <u>Due Process</u>

Alternatively, the Court finds that even if Munro had transacted business or engaged in "tortious conduct" in Connecticut, exercising personal jurisdiction over Munro would not comport with Fourteenth Amendment due process, which is the test the Court must apply for  personal jurisdiction.  This due process test is comprised of two related components: the "minimum contacts" analysis and the "reasonableness" analysis.  *Metro. Life Ins. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir.1996).

First, the Court must determine whether the defendant has sufficient "minimum contacts" with the forum state to justify the court's exercise of personal jurisdiction. 84 F.3d at 567 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "To have sufficient minimum contacts, a defendant must purposely avail himself of the privileges and benefits of the forum state." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). "Minimum contacts" are established when a defendant "purposely avail[s] himself of the privileges and benefits" of the forum state. *Hanson*, 357 U.S. at 253. This requirement prevents defendants from being haled into court based on "random, fortuitous or attenuated contacts." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985).

As discussed above, Munro's alleged limited contacts with Connecticut include receiving phone calls from Plaintiffs, who were calling from Connecticut to attempt to contract with TGF; responding to emails Plaintiffs sent from their computer in Connecticut; consummating sales contracts with Pamela Brewster of Stillmeadow Farm in Stonington, Connecticut, in Munro's capacity as managing member of TGF; and traveling to Connecticut on one or two occasions to assist Brewster in the care of purchased alpacas. Viewed in their sum total, these contacts, are insufficient for this Court to find that Munro personally has the requisite minimum contacts with the state.

Munro has testified, and the emails confirm, that Plaintiffs were the instigators of an attempted contract between the Ferraras and TGF. The Ferraras approached TGF in Springfield, Massachusetts, at a trade show to inquire if TGF had livestock for sale. Doc. 16, ¶ 2. Thereafter, the Ferraras solicited TGF by email, through electronic contact, and in person at TGF in Maine.[17]

_____

[17] For example, in her email to Munro on May 10, 2011, Melissa Ferrara acknowledges that she has sent a contract to Munro for TGF's approval and the proposed "terms for brokering are not really up for negotiations." Doc. 24-8, at 3. Moreover, "[w]e are working with several other New England farms and will be able to fill our Buyers' needs but were hoping to offer them as wide a variety of bloodlines as possible to choose from." *Id.* She also offers to visit TGF again, stating,

*Id.*, ¶¶ 4-6.  The Plaintiffs were the ones to solicit TGF to enter a contract.  Munro contests the allegation that a contract was ever formed between the parties; and Plaintiffs have presented no signed contract or email evidencing Munro's approval on behalf of TGF.  The one or two times Munro entered the state of Connecticut was to visit Brewster's Stillmeadow Farm, pursuant to TGF's sale of alpacas to that farm.  Munro never visited Connecticut on his own behalf or for his own pursuit.

The second component of due process analysis examines whether the assertion of personal jurisdiction comports with "traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316. The issue is whether personal jurisdiction is "reasonable" in the context of the specific case. *Id.*  It assures that the defendant receives  notice or "fair warning" that his conduct may subject him to suit in the forum state, *Bensmiller v. E.I. DuPont de Nemours & Co.*, 47 F.3d 79, 85 (2d Cir.1995). *See also World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) (A defendant may be subjected to personal jurisdiction only where his or her "conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.").

In the case at bar, even if Munro's contacts with Connecticut did constitute "minimum contacts," it would not be "reasonable" under the totality of the circumstances for Munro to anticipate being haled into court in Connecticut in his personal capacity.  There is no proof of a completed contract between Munro and  Plaintiffs in this action.  There is also no proof that TGF's few sales of alpacas to Stillmeadow Farm would provide Munro with "fair warning" that he himself could be haled into court in Connecticut in his individual capacity, as opposed to TGF as the party

---

"We are heading up to Maine this weekend . . . [and] [i]f you are around on Sunday, we may be able to come by and see the alpacas in person." *Id.,* at 3-4.

that made such sales. The alpacas, which were the subject of the sales, were raised in Maine, and it was TGF that, having sold the alpacas to Stillmeadow Farm, might reasonably expect to be haled into Connecticut courts should something go wrong with the sale.

Furthermore, with respect to "tortious conduct" by Munro, in Count Four of their complaint, Plaintiffs allege that Munro recklessly made representations that Plaintiffs "would receive the benefits set forth in the Contract if the Plaintiffs disclosed the identity of Ms. Brewster and her company to Munro and TGF." Doc. 1, ¶ 54. In so doing, Munro allegedly "interfered with the Contract by wrongly refusing to allow TGF to perform thereunder," which caused the Plaintiffs to suffer an actual loss in an amount that will be proven at trial. *Id.*, ¶ 61.

There is no indication that any of the alleged tortious conduct – *i.e.*, misrepresentations by Munro – occurred "within the state" of Connecticut, Conn. Gen. Stat. § 52-59b (a)(2). Moreover, if such conduct occurred in Maine and caused injury to Plaintiffs in Connecticut, *id*. § 52-59b(a)(3), Munro did not "regularly" do or solicit business or engage in a persistent course of conduct, or derive substantial revenue from goods used or services rendered.

In sum, as the Connecticut court found on two prior occasions, it would not be reasonable for Munro to expect to be haled into court in Connecticut in his personal capacity. To find otherwise would subject any employee who did the slightest amount of business in Connecticut on behalf of his employer to personal jurisdiction by Connecticut.

### 4.   No Proof of Waiver of Jurisdiction

Lastly, as an alternate basis to exert personal jurisdiction in a particular forum, a court may find the defendant has agreed to such jurisdiction, by agreeing to it or failing to object to its assertion. *See United States Trust Co. v. Bohart*, 197 Conn. 34, 39 (1985) ("Unlike subject matter

jurisdiction . . . personal jurisdiction may be created through consent or waiver."). A party to a contract may voluntarily submit to that contract's forum selection provision, choosing, for example, Connecticut as the forum for litigation arising under that contract. *See, e.g, HCR Pool III Funding Corp. v. PARCC Healthcare, Inc*., No. PJRCV020461562S, 2002 WL 1455775 at *2 (Conn. Super. Ct. May 28, 2002) (denying defendants' motion to dismiss for lack of personal jurisdiction due to language in contract forum selection clause).

In the case at bar, Plaintiffs have alleged but have yet to establish the existence of a formal contract with Munro's signature upon it. Munro testified by affidavit that he never signed any such contract with Plaintiffs. Absent the existence of a forum selection clause in a binding contract, Plaintiffs have failed to prove that Munro selected, and consented to, Connecticut as the proper forum for litigation arising under the alleged contract. *See, e.g.*, *LucidRisk, LLC*, 615 F. Supp. 2d at 6-7 (holding that individual defendants did not give consent to jurisdiction in Connecticut because "[t]he mere fact that the company voluntarily consented to jurisdiction in Connecticut is not a sufficient basis for finding jurisdiction over its officers").

Under the circumstances of this case, as the Connecticut Superior Court has twice ruled in prior cases between these parties, Plaintiffs have failed to meet the burden of making a prima facie showing to justify personal jurisdiction over defendant Ryen Munro in Connecticut.[18] Munro's

---

[18] As Defendants asserted in their Reply Memorandum [Doc. 25]:

[T]he second Connecticut case is substantially identical to the one before this Court. That state action commenced between the same litigants; and the Complaint contains four of the five claims that appear in the federal action at bar. Second Order [by this Court] at 17 (footnote omitted). Plaintiffs have had their opportunity to make their case on jurisdiction in Connecticut Superior Court – twice.

Doc. 25, at 7 (internal quotation marks omitted).

alleged actions neither constitute the requisite transaction of business nor the commission of a tortious act under Connecticut's long-arm statute. Moreover, and in any event, the totality of Munro's actions on behalf of TGF neither constitute the requisite "minimum contacts," nor make it reasonable for Munro to expect to be haled into court in this state. Finally, there is no evidence that Munro consented to personal jurisdiction by Connecticut.

The motion of the individual Defendant, Ryen Munro, to dismiss the complaint as to him will be granted pursuant to Rule 12(b)(2) for lack of personal jurisdiction over him.

## C.  Prior Pending Action Doctrine and Federal Abstention

In their Motion to Dismiss, both Defendants asserted that this entire case should be dismissed under the "prior pending action" doctrine. Doc. 15, at 9. Defendant TGF's bankruptcy petition then intervened. For purposes of this Ruling, the Court construes this argument as an alternative basis upon which to dismiss this action against Ryen Munro, who is not a bankruptcy debtor, and thus not subject to the automatic stay.

Defendants quote *Ragan v. Merch. Transfer & Warehouse Co., Inc.*, 337 U.S. 530, 533 (1949) to assert that "when a cause of action is created by local law, the measure of it is to be found only in local law" so that "[w]here local law qualifies or abridges [a state action], the federal court must follow suit." *See also Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). As Defendants summarize, "a federal court sitting purely in diversity cannot confer additional rights upon a party that the party would not enjoy in state court. Put another way, if Connecticut law entitles the Defendants to dismissal in a Connecticut state court, it entitles them to dismissal in a Connecticut federal court." Doc. 15, at 10 (discussing *Erie*, 304 U.S. at 78).

However, the doctrine described by Defendants is not actually "the prior pending action"

doctrine. In *Erie R. Co. v. Tompkins*, the United States Supreme Court stated:

> Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state. And whether the law of the state shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern. There is no federal general common law.

304 U.S. at 78. "Under the Erie doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." *Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 152 (2d Cir. 2013) (quoting *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996)). This Court recognizes the *Erie* doctrine and, consequently, applies the substantive law of the state of Connecticut, where applicable.

In federal courts, the "prior pending action doctrine" applies to the situation where there are two parallel cases *pending in federal* court – the same jurisdiction. The prior pending action doctrine promotes federal judicial efficiency, as it is designed "to avoid placing an unnecessary burden on the federal judiciary, and to avoid the embarrassment of conflicting judgments." *Curcio v. Hartford Fin. Servs. Grp.*, 472 F. Supp. 2d 239, 243 (D. Conn. 2007) (quoting *Holliday v. City of Newington*, No. 03cv1824 (SRU), 2004 WL 717160, at *1 (D.Conn. Mar. 19, 2004)). It provides that "[w]here there are two competing lawsuits, the first suit should have priority, absent the showing of balance of convenience . . . or . . . special circumstances . . . giving priority to the second." *Adam v. Jacobs*, 950 F.2d 89, 92 (2d Cir. 1991) (quoting *First City Nat'l Bank and Trust Co. v. Simmons*, 878 F.2d 76, 79 (2d Cir.1989)). Where there is a prior pending action, the district court may either stay or dismiss the second-filed case in deference to the first.[19] "The decision whether or not to stay

---

[19] Connecticut state courts also employ the "prior pending action" doctrine. *See, e.g.*, *Halpern v. Bd. of Educ. of City of Bristol*, 196 Conn. 647, 655 (1985). The Connecticut Supreme Court included in its requirements that the doctrine apply only to cases pending "in the same jurisdiction" – Connecticut state court. *See Kleinman v. Chapnick*, 140 Conn. App. 500, 505 (2013)

or dismiss a proceeding rests within a district judge's discretion." *Adam,* 950 F.2d at 92 (citing *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 183-84 (1952)).

The case at bar is not such a case. Rather, the action before me is in a *federal* court, and the prior pending action is in a *state* court. In that circumstance, the appropriate analysis is found in *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817 (1976). *See, e.g., Bradley v. Kelly*, 479 F. Supp. 2d 281, 284 (D. Conn. 2007). *See also Wenegieme v. Bayview Loan Servicing*, No. 14 CIV. 9137 RWS, 2015 WL 2151822, at *3 (S.D.N.Y. May 7, 2015) ("[T]he prior pending action doctrine is limited to situations where two overlapping lawsuits are both pending in federal court, while the foreclosure action [between the parties] is taking place in Maryland state court. Between state and federal court cases, on the other hand, the general rule is that "the pendency of an action in the state court is no bar to proceedings concerning the same matter in the federal court having jurisdiction.") (quoting *Colorado River*, 424 U.S. at 817).

In *Colorado River*, the Supreme Court created a doctrine which "rest[s] not [up]on considerations of state-federal comity or on avoidance of constitutional decisions, as does abstention, but on considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *Larobina v. Comm'r of Transp.*, 03CV217 (EBB), 2005 WL 2789321, at *3 (D.Conn. Oct. 25, 2005) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 14–15 (1983)). That particular form of abstention, fashioned

---

("[W]e conclude that the trial court must determine in the first instance whether the two actions are: (1) exactly alike, *i.e.*, for the same matter, cause and thing, or seeking the same remedy, *and in the same jurisdiction*; (2) virtually alike, *i.e.*, brought to adjudicate the same underlying rights of the parties, but perhaps seeking different remedies; or (3) insufficiently similar to warrant the doctrine's application.") (emphasis added).

in *Colorado River,* applies where, as in the instant case, "state and federal courts exercise concurrent jurisdiction simultaneously." *Vill. of Westfield v. Welch's*, 170 F.3d 116, 120 (2d Cir. 1999) (quoting *Burnett v. Physician's Online*, Inc., 99 F.3d 72, 76 (2d Cir.1996)). "The Supreme Court held that although a pending action in a state court does not generally bar proceedings involving the same matter in a federal court, a federal court may dismiss a federal suit for 'reasons of wise judicial administration' under 'exceptional circumstances.'" *Id*. (quoting *Colorado River*, 424 U.S. at 818).[20]

To determine whether abstention under *Colorado River* is appropriate, a district court must analyze six factors, with the balance heavily weighted in favor of the exercise of jurisdiction. *Vill. of Westfield*, 170 F.3d at 121 (citing *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 16). These factors include:

1.     the assumption of jurisdiction by either court over any res or property;

2.     the inconvenience of the federal forum;

3.     the avoidance of piecemeal litigation;

4.     the order in which jurisdiction was obtained;

5.     whether state or federal law supplies the rule of decision; and

6.     whether the state court proceeding will adequately protect the rights of the party seeking to invoke federal jurisdiction.

*Id.* No particular factor is "necessarily decisive" and the weight afforded any one factor varies from

---

[20] Thereafter, in the context of an action for declaratory relief, in *Wilton v. Seven Falls Co.*, 515 U.S. 277, 279 (1995), the United States Supreme Court resolved the issue of whether a "discretionary standard . . . governs a district court's decision to stay a declaratory judgment action during the pendency of parallel state court proceedings." The Supreme Court affirmed the Fifth Circuit in upholding the district court's decision to stay an action for declaratory relief "where parallel proceedings, presenting opportunity for ventilation of the same state law issues, were underway in state court." *Id.* at 290

case to case. *Id.* "[T]he test ... is no mechanical checklist." *Id.*

In order to abstain under *Colorado River,* the district court must make "a finding that the concurrent proceedings are 'parallel.'" *Dittmer v. Cty. of Suffolk*, 146 F.3d 113, 117-18 (2d Cir.1998). "Suits are parallel when substantially the same parties are contemporaneously litigating substantially the same issue in another forum." *Id.* (quoting *Day v. Union Mines Inc.*, 862 F.2d 652, 655 (7th Cir.1988)). Based on the substantially similar parties and substantive claims in the state and federal cases, the Court finds the present suits to be "parallel."

Furthermore, four of the six *Colorado River* factors support a finding of abstention.[21] First, the avoidance of "piecemeal litigation" is implicated in that results in state court, in a substantially identical action, could ultimately conflict with resolution of the case by this Court. Second, jurisdiction was first obtained by the Connecticut state court. The action was filed first in state court and has progressed further than this action before the automatic stay relating to bankruptcy arose. Third, Connecticut substantive law applies as to the elements of the exclusively state law claims brought in this diversity action.[22] Fourth, the Connecticut state proceeding will adequately protect

---

[21]  The Court notes that there is no particular piece of real or tangible property rights in dispute; and there is the same amount of inconvenience in litigating in state or federal court where both courts sit in Connecticut.

[22]  In their Complaint filed in this Court, Plaintiffs have included the following state law claims against all Defendants: breach of contract, unjust enrichment, breach of the implied covenant of good faith and fair dealing, and violation of Connecticut's Unfair Trade Practices, Conn. Gen. Stat. § 42-110a, *et seq*.  In addition, Plaintiffs have asserted a claim for tortious interference with contractual relations against individual defendant Munro.

The Court notes that even if the abstention issue were not present, the Court would find no personal jurisdiction over Ryen Munro so that the tortious interference claim would necessarily expire upon his removal from the action.

the rights of the parties. Plaintiffs, Connecticut residents, have asserted their Connecticut claims in a Connecticut court. Thus, they cannot be opposed to final disposition by a state court. Here, the Plaintiffs, Defendants, factual allegations, and four of the five counts in the Complaint are identical to the currently pending Connecticut case. The only additional claim, alleging tortious interference, arises from the same nucleus of operative facts as the other claims and could have been brought in either of the two prior Connecticut state cases. *See, e.g., Zachs v. Pub. Utilities Comm'n*, 171 Conn. 387, 393 (1976) ("all prayers for relief contained in the complaint before us could have been asserted in the prior action still pending before the trial court, and the failure of a party to claim in a prior action relief which could have been asserted is insufficient reason to refuse to sustain a plea in abatement") (citing *Cohen v. Davis*, 152 Conn. 639, 641 (1965)).[23]

Because several factors weigh heavily in favor of abstention under *Colorado River*, the Court will alternatively grant defendant Ryen Munro's motion to dismiss on the basis of abstention. *See, e.g., Telesco v. Telesco Fuel and Masons' Materials, Inc.*, 765 F.2d 356 (2d Cir.1985) (affirming district court's dismissal of federal diversity action in favor of concurrent state action under the *Colorado River* doctrine where federal complaint concerned same events and sought same relief as state court action, federal law did not provide the rule of decision, the two state actions were filed over four and one-half years and two years prior to the federal action and the Court noted the "vexatious" nature of the federal suit). If this Court were permitted to exercise personal jurisdiction

---

[23] Because there is no federal question implicated in this case, no principle of federal jurisdiction requires this Court to entertain this case. There is no need or good reason for this Court to proceed in a diversity case, governed by state law, when these same Plaintiffs are pursuing materially the same claims against the same parties in the Pending Connecticut Case.

over Munro, this is an alternative basis to dismiss this action.[24]

At this time, the parallel state case before the Connecticut Superior Court is also stayed in light of TGF's filing for protection under Chapter 7, Title 11 of the U.S. Bankruptcy Code, on October 6, 2017. The last entry in that state case is an "Affidavit of Bankruptcy"[Doc. 229] filed by George M. Purtill, counsel for TGF. Thereafter, the court has indicated "No Events Scheduled." Because both this case and the state case remain stayed pursuant to 11 U.S.C. § 362(a), the Court makes no determination on the abstention issue with respect to TGF. However, upon the lifting of the automatic stay, federal abstention is an issue that will have to be addressed before any substantive matters may be resolved. The Court will then make a final ruling on the Motion to Dismiss as to TGF.[25]

## V. <u>CONCLUSION</u>

For the foregoing reason, upon careful review of the Affidavits and legal arguments submitted by the parties, all of Plaintiff's claims pending against defendant Ryen Munro are dismissed for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).

---

[24] The only reason Munro is currently present in this action, and not in the state action, is that he has already had his motion to dismiss for lack of personal jurisdiction granted in the state case. The parties at the commencement of that action were the same as those brought before this Court.

[25] In its "Second Order on Subject Matter Jurisdiction" [Doc. 23], the Court has previously addressed the issue of potential abstention from proceeding with this action where its jurisdiction is concurrent with that of the Connecticut Superior Court and there is a parallel, substantially identical, case, *Ferrara, et al. v. Munro, et al.*, Case No. MMX-CV15-601059-S (Conn. Super. Ct. 2015), to the one before this Court. *See* Doc. 23, at 16-20. As the Court stated, "suffice it to say, . . . there are factors present which favor abstention." *Id.* "The concurrent cases in state and federal court may result in 'piecemeal litigation;' this action was brought in federal court after the state action was commenced; all four claims presented are state law claims; and the state court action is likely adequate to protect the interests of the parties." *Id.* (citing *Telesco v. Telesco Fuel and Masons' Materials, Inc.*, 765 F.2d 356 (2d Cir.1985)).

Alternatively, the Court abstains from proceeding with all claims against Munro under the *Colorado River* doctrine because "state and federal courts exercise concurrent jurisdiction simultaneously." *Vill. of Westfield v. Welch's*, 170 F.3d 116, 120 (2d Cir. 1999). The state and federal suits are essentially parallel because substantially the same parties are contemporaneously litigating substantially the same issues in another forum. Moreover, the bulk of the *Colorado River* factors militate in favor of abstention.

The claims against TGF remain automatically stayed while that party is a debtor in bankruptcy court. Within 14 days following the termination of the action in bankruptcy court, counsel for the parties are directed to inform the Court of that event so that the Court may lift the stay. When the stay is lifted, Plaintiffs must notify the Court as to whether they wish to proceed against TGF in this action, withdraw the action, or request a settlement conference before a magistrate judge. Until that time, the portion of the present motion to dismiss that pertains to the claims against the debtor TGF remain pending but stayed.

Defendants' "Motion to Dismiss" [Doc. 14] is GRANTED as to Ryen Munro and remains stayed as to defendant Tripping Gnome Farm, LLC.

The foregoing is So ORDERED.

Dated:   New Haven, Connecticut
            March 23, 2018


                                        */s/Charles S. Haight, Jr.*
                                        CHARLES S. HAIGHT, JR.
                                        Senior United States District Judge